UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------x
                                      :
PAUL GELINAS                          :              3:13 CV 891 (JGM)
                                      :
V.                                    :
                                      :
CAROLYN W. COLVIN,                    :
ACTING COMMISSIONER OF                :
SOCIAL SECURITY                       :
                                      :              DATE: FEBRUARY 18, 2014
------------------------------------------------------ x
```

<u>RECOMMENDED RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER, AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE
COMMISSIONER</u>

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"].

<u>I.  ADMINISTRATIVE PROCEEDINGS</u>

On July 21, 2010, plaintiff, Paul Gelinas, applied for DIB claiming that he has been

disabled since April 15, 2009 due to a degenerative joint, disc and hip disorder, swelling in

his legs, and atrial fibrillation. (Certified Transcript of Administrative Proceedings, dated

August 28, 2013  ["Tr."] 158-61; <u>see also</u> Tr. 183-94).  Plaintiff's application was denied

initially and upon reconsideration.  (Tr. 86-90, 93-96; <u>see</u> Tr. 66-85).  On February 10, 2011,

plaintiff filed a request for a hearing before an Administrative Law Judge ["ALJ"](<u>see</u> Tr. 97-

103),[1] and on January 19, 2012, a hearing was held before ALJ James E. Thomas, at which

plaintiff and Renee Jubree, a vocational expert (Tr. 140-41), testified. (Tr. 26-65; <u>see</u> Tr.

104-57).  Plaintiff has been represented by counsel.  (Tr. 91-92).  On April 27, 2012, ALJ

---

[1]The request itself is not in the administrative record.

Thomas issued his decision finding that plaintiff has not been under a disability from April 15, 2009 through the date of his decision.  (Tr. 9-21).  On May 4, 2012, plaintiff filed his request for review of the hearing decision (Tr. 8), and on May 29, 2013, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).

On June 20, 2013, plaintiff filed his complaint in this pending action.  (Dkt. #1).[2]  On September 26, 2013, defendant filed her answer (Dkt. #15), along with a certified copy of the administrative transcript, dated August 28, 2013, and on November 25, 2013, plaintiff filed his Motion to Reverse the Decision of the Commissioner, with brief in support.  (Dkt. #18).  On January 27, 2014, defendant filed her Motion to Affirm the Decision of the Commissioner and brief in support (Dkt. #19).

For the reasons stated below, plaintiff's Motion for Reversal or Remand (Dkt. #18) is granted in part such that this matter is remanded for further consideration consistent with this Recommended Ruling; defendant's Motion to Affirm (Dkt. #19) is denied.

## II. FACTUAL BACKGROUND

### A. ACTIVITIES OF DAILY LIVING AND HEARING TESTIMONY

Plaintiff was born in 1961 and is fifty-two years old.  (Tr. 29).  Plaintiff completed two years of technical school after high school (Tr. 29, 188), and he is married and has two children.  (See Tr. 195, 240).

Plaintiff has a driver's license but "[v]ery rarely[]" drives because his right hand is "totally numb from the fingers to the wrist" and he has a "problem with [his] neck, [his]

---

[2]Plaintiff also filed a Motion to Proceed in Forma Pauperis (Dkt. #3), followed by a renewed Motion to Proceed in Forma Pauperis filed on June 24, 2013 (Dkt. #10; see Dkt. #9), which motion was granted the same day.  (Dkt. #11).

vertebrae in [his] neck radiating down to [his] shoulders." (Tr. 34). According to plaintiff, over the nine months prior to his hearing, he started noticing a "snapping, cracking noise feeling in the back of [his] neck[,]" with pain into his shoulder, around his arm, and radiating towards his hand. (Tr. 46). Plaintiff testified that he has total numbness in his right hand caused by carpal tunnel syndrome, which was diagnosed by an electromyography ["EMG"] test prior to the hearing, but which records were not produced to the ALJ in advance of the hearing. (Tr. 44). According to plaintiff, when he was working, he noticed that his arm and wrist would "hurt more[,]" but he thought it was "more over extending" because he was using his hands all day at work. (Tr. 45). Plaintiff testified that he is right-handed but his fingers are numb so it is difficult for him to write even a short sentence or to put buttons through button holes. (Tr. 48-49).

In addition to his neck and hand pain, plaintiff testified that he has had pain in his legs since he was thirteen years old, getting "progressively worse[ ]" over time. (Tr. 37). He has nerve damage in his ankles into his feet and he has worn compression stockings for at least a year for the swelling in his legs. (Id.). Plaintiff testified that he can only stand for about one hour before having to sit, and he can only stand for "minutes" without holding on to something. (Tr. 39). According to plaintiff, in accord with his doctor's recommendation, he sits in a reclined chair with a pillow and elevates his feet for "hours on end[,]" or three to four hours a day, which allows the swelling to "subside . . . slightly." (Tr. 38-39; see also Tr. 324). He can sit in a cushioned chair for about thirty minutes at a time, but cannot sit in a hard chair as the latter puts pressure "up into [his] hip bone." (Tr. 41-42). When he sits in a regular chair with his feet on the floor for more than fifteen or twenty minutes, his legs start to swell. (Tr. 42). When he lays down, he places a pillow between his knees "to try

to keep the hip from pulling down from the socket." (Tr. 40-41). As a result of the discomfort, he sleeps only three or four hours a night. (Tr. 41).

Plaintiff testified that he had an pin inserted into his hip when he was fourteen or fifteen years old, which was removed a year or two later, which has left him with no cartilage between the ball joint and the hip plate. (Tr. 40). Additionally, his ankle has been "totally black and blue" for the past "[fifteen] years." (Tr. 46). He testified that he went to therapy for his foot, and his right foot is turned out twenty degrees, which causes problems when he walks. (Tr. 47). If he does not keep his feet elevated, they swell too. (Id.). Plaintiff opined that the pain in his ankle is "anywhere[] from [six] to [eight]" on a scale to ten. (Id.). Plaintiff initially testified that he uses a cane and has walked with a limp since he was thirteen (Tr. 43), but then clarified that he uses the cane occasionally, as in "more towards the middle, end of the day when [he is] really starting to . . . hurt more." (Tr. 50-51). Plaintiff takes or has taken Toprol/Metoprolol, Nexium, Aleve, Voltaren, Celebrex and Tramadol. (Tr. 197, 286, 326).

His wife does all of the grocery shopping now, and back in 2009, he would wait at the front of the store while his children would pick up the items he needed. (Tr. 43). According to plaintiff, his wife does all of the cooking and laundry (Tr. 44, 196 ("spouse does all the housework.")); plaintiff is limited to preparing sandwiches. (Tr. 197). He uses a riding mower for short periods (Tr. 198), and he enjoys playing with his children but is not "able to get around with them." (Tr. 199). Plaintiff needs bath handles to hold onto in the shower and to get out of his tub (Tr. 196), and he is unable to walk "long" distances, defined as more than one hundred feet, nor is he able to climb stairs. (Tr. 200-01). At his hearing, plaintiff testified that he can walk for about fifteen to eighteen feet "at the most" and when

4

he walks, it hurts his ankles and his right hip.  (Tr. 39).  Additionally, according to plaintiff, his impairments affect his ability to lift, squat, bend, stand, reach, sit, kneel, and see.  (Tr. 200).

On a typical day, plaintiff watches television or listens to the radio; he does not read, and he tires easily because of his pain.  (Tr. 47-48, 195).   Plaintiff testified that reading is difficult because of his eyesight (Tr. 48); he cannot focus and he gets blurred vision as a result of a "depth of field defect[,]" that he testified is not correctable by eyeglasses. (Tr. 57-59).[3]

When asked about the prospect of hip surgery, plaintiff testified that his wife just went back to work and received health insurance, but the deductible is "very large" and he is "not in the position right now to be able to afford that and be in rehab."  (Tr. 49).

## B. PLAINTIFF'S WORK HISTORY & VOCATIONAL ANALYSIS

Plaintiff testified that he last worked as an electrical engineer or compliance specialist in the lighting field; in that job he would review lighting procedures for safety and mechanical reasons.  (Tr. 34, 188; see Tr. 217).  To perform this work, plaintiff would have to climb ladders, use his hands, and carry large transformers or batteries that would weigh anywhere between ten to fifty pounds.  (Tr. 35, 218-21).  He performed this work for twenty-five years. (Tr. 34; see Tr. 217).  His last employer was Elliptipar in West Haven, Connecticut, but while working there, he had difficulty performing his job-related tasks like bending over, picking things up, and mounting fixtures, as well as getting down on his knees to perform the necessary electrical testing.  (Tr. 36).  He testified that he was "let go" on April 15, 2009 because he was no longer able to perform his job-related tasks.  (Id.; see Tr. 187).

---

[3]There are no medical records substantiating plaintiff's vision impairment.  (Tr. 58). See note 4 infra.

At his hearing, plaintiff testified that the "more time that [he] spent on [his] feet[,] the more pain" he would have such that by the end of the day, he was "basically limping around." (Tr. 38). At the end of the day, his legs would turn red and purple and they would be one and a half their normal size. (Id.). According to plaintiff, now he can only lift about five pounds, and before he started having problems with his hands, he could lift and carry ten pounds for a "very short distance." (Tr. 50). He opined that he would be limited to ten pounds because of the pressure that greater weight puts on his feet and hips, which has worsened over time. (Id.).

The vocational expert testified that plaintiff's past work as a compliance specialist, or electronics inspector, is light skilled work that would be classified at the medium level. (Tr. 51). Upon examination by the ALJ, the vocational expert testified that an individual who can work at the sedentary level with occasional climbing of ramps and stairs, no climbing of ropes, ladders, or scaffolds, and occasional balancing, stooping, kneeling, crouching, and crawling, and who requires the use of a cane for periods of ambulation, could perform the work of an inspector of light fixtures which is sedentary, semi-skilled work. (Tr. 53-54). Upon examination by plaintiff's counsel, the vocational expert testified that if such an individual had to take two additional breaks in the morning and in the afternoon, each lasting fifteen minutes so that the individual could elevate his legs, such an individual could not perform the jobs described. (Tr. 55). Additionally, if the individual was fifteen percent slower in the performance of the inspection work, such an individual would not be able to perform the work of an inspector of lighting fixtures. (Tr. 55-56). When the ALJ added the limitation of occasional use of depth perception, the vocational expert testified that such a

person would not be able to perform the inspection work.  (Tr. 59).[4]

## C. MEDICAL RECORDS

Plaintiff's onset date of disability is April 15, 2009; accordingly, the relevant medical records begin on July 6, 2010, when plaintiff was seen by his primary care physician, Dr. Dennis C. King of Greater Waterbury Primary Care[5] for complaints of joint pain in the bilateral hip and leg pains.[6]  (Tr. 250, 275; see Tr. 250-54, 275-79).  Dr. King noted that plaintiff was "discharged from his previous employment because he could no longer carry the necessa[r]y weight." (Tr. 250, 275).  Additionally, Dr. King noted that plaintiff's atrial fibrillation[7] was stable, and his varicose veins on his lower right side were noted.  (Tr. 250-53, 275-77).  Dr. King referred plaintiff to an orthopedic surgeon  (Tr. 253, 278), and one week later, plaintiff was seen by Dr. Lee Rubin of Orthopaedics New England.  (See Tr. 243-

---

[4]During the hearing, the ALJ noted that "[n]ormally," he would request a medical interrogatory so that he would have a medical opinion of plaintiff's vision limitations, but he continued, "I don't really know of another doctor who's going to know . . . it's a depth perception defect, and I have no idea what that means, medically." (Tr. 60).   The ALJ then stated, "it seems to me now the critical issue in this case, assuming the onset date is amended [to plaintiff's 50th birthday,] would be whether he has any restriction in vision, and based on [the vocational expert's] testimony that would eliminate these two jobs." (Tr. 61).  After consulting with plaintiff, his counsel stated on the record that plaintiff did not want to amend his onset date.  (Tr. 62).  Plaintiff's counsel was to attempt to obtain an explanation of plaintiff's depth perception defect and the ALJ acknowledged that if that was "not forthcoming[, then he would] send [the file] out for someone to look at[.]" (Tr. 63).  The ALJ left the record open for thirty days.  (Tr. 63-64).  In his decision, the ALJ noted that "[t]he claimant failed to submit additional evidence after the hearing, despite the opportunity to do so." (Tr. 15).

[5]Previously, on September 19, 2006, plaintiff was seen for recurrent chest pain at Cardiology Associates of Waterbury, P.C.; he was prescribed a low dose aspirin daily and was taking Toprol.  (Tr. 299-300, 302; see Tr. 231-33).  Plaintiff was seen again on February 28, 2008 by Dr. Stephen Widman for atrial fibrillation; he was advised to continue on Toprol.  (Tr. 228-30, 301, 303-04).

[6]As referenced above, plaintiff underwent bilateral hip surgery when he was thirteen, fourteen or fifteen years old.  (See Tr. 40, 239, 243, 251, 261).  A slipped capital femoral epiphysis pinning was performed at that time, and the screws were later removed.  (See Tr. 283).

[7]See note 5 supra.

7

44, 261-64).

Dr. Rubin noted that diagnostic images of plaintiff's pelvis revealed that the joint space on the right is markedly narrowed and the femoral head is flattened at the superior aspect, which is consistent with degenerative joint disease.  (Tr. 243, 261, 263). Additionally, Dr. Rubin opined that while plaintiff "seems to have gotten [thirty-six] years of good use out of this hip[,]" plaintiff's "hip condition has worsened over time and he now has evidence of flattening of the femoral head and destruction of the cartilage in the joint."  (Tr. 244, 262, 264).  According to Dr. Rubin, plaintiff's condition "would be best treated with a total hip arthroplasty and a ceramic articulation given his relatively young age.  He may also benefit from oral anti-inflammatories in the meantime[,]" and a hip steroid injection could be considered, if his pain level was "rather acute."  (Id.).  Dr. Rubin continued, "[t]he patient explained to me that his insurance is running out through COBRA in the next [two] weeks, and I have told him that his hip surgery is not an urgent or emergent need and thus it would be hard to justify rushing him to the hospital to have a hip replacement in the next [ten] to [fourteen] days."  (Id.).  The hip surgery "can be done safely at some time in the next few months or few years and the only danger of waiting is that he may have ongoing pain and stiffness in the hip."  (Id.).

Plaintiff underwent a ultrasound of his leg on July 16, 2010 at the request of vascular surgeon Dr. Giuseppe Tripodi, which test revealed moderate to severe reflux in the mid thigh, distal thigh, knee and proximal calf.  (Tr. 246-47, 256-58; see Tr. 259-60).  Four days later, on July 20, 2010, plaintiff was seen by Dr. King, who noted that plaintiff "certainly cannot [do his job as an electrical/lighting technician] with his [h]ip DJD [degenerative joint disease]."  (Tr. 238, 270; see Tr. 238-42, 270-74).  Dr. King suggested to plaintiff that he

see an orthopedist for a follow up, but plaintiff informed him that he had no insurance and that such treatment would have to wait until he obtained insurance. (Tr. 241, 273).  On July 26, 2010, plaintiff was treated for pain in his feet, which was diagnosed as porokeratosis. (Tr. 235-36).  There are no treatment records for the next six months.

On January 31, 2011, plaintiff's podiatrist, Dr. James M. Dejesus, prescribed surgical compression stockings for plaintiff.  (Tr. 294).   He noted diagnoses of varicose veins with ulcer and inflammation; other specified viral warts; and congenital keratoderma.  (Tr. 295).

Plaintiff returned to Dr. King on April 7, 2011 to complete orthopedic disability forms; Dr. King "directed [plaintiff] to his orthopedic physician as [Dr. King] could not answer the questions." (Tr. 265; see Tr. 265-69).  Dr. King noted persistent hip pain, a trace of edema in plaintiff's lower extremities, and lower extremity varicose veins.  (Tr. 268).[8]

On November 21, 2011, plaintiff was seen by Dr. David L. Forshaw of Neurosurgery, Orthopaedics & Spine Specialists, PC for complaints of right-sided heavy body numbness for the past six months.  (Tr. 286-87).[9]  The numbness awakes him from sleep and it is worse in the entire right hand into his right arm.  (Tr. 286). When his hand is numb, he has difficulty using it.  (Id.).  Dr. Forshaw noted that plaintiff walks with a "very stiff limp[,]" and he "stands with discomfort[,]" and "rises from a chair with moderate discomfort." (Tr. 286-87).  Dr. Forshaw  also noted that plaintiff walks with a "shuffling, dragging his right leg with an outward turned foot." (Tr. 287).  He opined that plaintiff has peripheral polyneuropathy in the lower extremities, and he noted his concern "about any other metabolic etiologies for his polyneuropathy as well as his tremor and icterus."  (Id.).

---

[8]On September 4, 2011, plaintiff was seen by Primary Care Partners for left arm swelling after a bee bite.  (Tr. 328-29).

[9]Plaintiff's podiatrist, Dr. James M. Dejesus, referred plaintiff to Dr. Forshaw.  (Id.).

At Dr. Forshaw's request, plaintiff underwent an MRI of his cervical spine on December 1, 2011, the results of which revealed spondylosis, most significant from C4 to C7; superimposed protrusions at C3-4, C5-6 and C6-7; significantly narrowed right neural foramina at C5-6; and disk herniation at C4-5 causing mild cord compression, greater to the left of midline.  (Tr. 288).  An MRI of the lumbar spine, performed the same day, revealed a small left paracentral protrusion at L5-S1.  (Tr. 289).  Eight days later, plaintiff underwent a CT scan of his cervical spine which revealed spondylotic changes of the cervical spine at C5-6 and C6-7 with posterior osteophyte-disc complexes and posterior facet and uncovertebral joint hypertrophy.  (Tr. 290; see Tr. 290-91).  Additionally, there was mild central spinal stenosis at C5-6, and moderate left and moderately severe right C5-6 and moderate bilateral C6-7 neuroforaminal stenosis.  (Tr. 290).

Plaintiff was seen by Dr. Robert Carangelo of Orthopedic Surgeons of Central Connecticut, P.C. on November 29, 2011 for his hip pain localized to the right groin and anterior thigh.  (Tr. 283; see Tr. 283-84).  Plaintiff reported difficulty putting on his shoes and socks, walking more than a block, and taking stairs, which he needs to do one at a time, holding the railing for support and occasionally using a cane.  (Tr. 283).  Dr. Carangelo noted that plaintiff walks with an antalgic gait, his hip range flexion is eighty degrees with a twenty-five degree fixed external rotation contracture, his abduction is ten degrees, and his right leg is shorter than the left by 5 mm.  (Id.).  Imaging demonstrates "obvious slipped capital femoral epiphysis with retroversion of the femoral head[,]" "loss of the hip joint space with less than 1 mm existing in Zone 1[,]" and "bone on bone" in Zone 1.  (Id.).  Dr. Carangelo opined that plaintiff's symptoms are consistent with osteoarthritis secondary to slipped capital femoral epiphysis, and the doctor informed plaintiff of conservative treatment

options of anti-inflammatories, physical therapy, activity modification and cortisone injections, or of undergoing total hip arthroplasty. (Id.).   Plaintiff opted to take anti-inflammatories as necessary.  (Tr. 284).

On December 6, 2011, plaintiff was seen by Dr. Marc Kawalick of Neurologic Associates, P.C. upon referral by Dr. Carangelo for further evaluation of numbness of the right upper and right lower extremity.  (Tr. 312-14).  Plaintiff reported that the symptoms began a year and a half earlier and have progressed over time.  (Tr. 312).  Dr. Kawalick noted that "[f]urther questioning reveal[ed] that [plaintiff] has had episodes of intermittent blurred vision in the right eye."  (Id.).  Upon examination, plaintiff had diminished pin sensation in the right upper extremity, and in the right lower extremity the pin sensation was blunted distally.  (Tr. 313).  He noted that the "[p]osition sense appears mildly reduced in the lower extremities bilaterally and there is mild to moderate reduction in vibration sense." (Id.).  His gait was primarily antalgic secondary to right hip pain.  (Id.).  Dr. Kawalick opined that the right upper extremity numbness could certainly be related to plaintiff's cervical disease but the combination of right upper and lower extremity numbness needed further evaluation as the "combination of monocular visual disturbance and the hemisensory numbness could potentially reflect demyelinating changes." (Tr. 314).  Dr. Kawalick wanted to "be sure that [plaintiff] did not have carotid stenosis[ ]" or Raynaud's phenomena.  (Id.).[10] Accordingly, on December 20, 2011, plaintiff underwent an MRI of his brain which revealed white matter signal abnormalities, and "mild wispy foci within the central aspect of the pons. The appearance is nonspecific, but chronic microvascular change is considered the most

_____

[10]On December 15, 2011, plaintiff was seen at Primary Care Partners by Dr. Alvarez for plaintiff right side numbness, swelling of his right foot, decreased strength in his right arm and leg, and right hip pain.  (Tr. 326-27).

likely etiology." (Tr. 315). An ultrasound of plaintiff's carotid artery revealed no significant stenosis. (Tr. 316-17). An EEG, also performed on December 20, 2011, revealed evidence of carpal tunnel syndrome in plaintiff's right wrist, "[n]o significant evidence of peripheral neuropathy[,] [t]hough the peroneal sensory response was unelicitable, this is of uncertain significance[,]" and no evidence of cervical radiculopathy. (Tr. 318-20).

On January 12, 2012, Dr. Dejesus opined that plaintiff is restricted due to his "foot disability" such that he "[m]ust wear surgical stockings [and] elevate [his] feet to reduce swelling and pain from nerve damage." (Tr. 293, 296, 321). On January 19, 2012, plaintiff was referred to physical therapy for his cervical spondylosis. (Tr. 311). Plaintiff returned to Dr. Dejesus on January 25, 2012 for his "severe right leg pain due to varicose and severe venous stasis causing difficulty to walk or sit in the dependent position." (Tr. 324). Dr. Dejesus advised plaintiff to "keep his leg elevated at all times otherwise his right leg swells and causes too much pain." (Id.). Dr. Dejesus stated that he did "not feel that patient can work standing or sitting due to need to keep his right extremity elevated at all times[,]" and because he "should wear compressive stockings at all times." (Tr. 324).

Plaintiff underwent an MRI of his right hip on November 2, 2012 which revealed degenerative joint changes of the right hip with osteophyte formation related to right temporal acetabular impingement. (Tr. 332). Additionally, an "[u]nusual configuration of the right femoral head and neck" that "could be related to old injury" was noted. (Id.).

D. MEDICAL OPINIONS

On October 27, 2010, Dr. Virginia H. Rittner completed a Residual Functional Capacity Assessment of plaintiff for SSA, in which she opined that plaintiff was limited to lifting and/or carrying twenty pounds occasionally and ten pounds frequently; he could stand and/or walk

for two hours and sit for six hours in an eight-hour day; he could occasionally climb ramps and stairs, and could balance, stoop or kneel; he could never climb ladders, rope or scaffolds, and could never crouch.  (Tr. 69-74).  On January 10, 2011, Dr. Joseph Connolly, Jr. completed a Residual Functional Capacity Assessment of plaintiff in which he reached the same conclusions as Dr. Rittner.  (Tr. 79-83).

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008), quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)); see also 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the

entire record to determine the reasonableness of the ALJ's factual findings.  See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See  42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment.  See 20 C.F.R. §§  404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. §§  404.1520(a)(4)(iii), 416.920(a)(4)(iii); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that he cannot perform her former work.  See 20 C.F.R. §§  404.1520(a)(4)(iv), 416.920(a)(4)(iv).

14

If the claimant shows that she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

## IV. DISCUSSION

Following the five step evaluation process, ALJ Thomas found that plaintiff has not engaged in substantial gainful activity since April 15, 2009, the alleged onset date of his disability. (Tr. 14; see 20 C.F.R. §§ 404.1571 et seq.). ALJ Thomas then concluded that plaintiff has the following severe impairments: degenerative disc disease, osteoarthritis and varicose veins with venous insufficiency (Tr. 14-15; see 20 C.F.R. § 404.1520(c)), but his impairment or combination of impairments do not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404. (Tr. 15-16; see 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). In addition, at step four, ALJ Thomas found that after consideration of the entire record, plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R § 404.1567(b) except that he can perform only occasional climbing of stairs and ramps, no ropes, ladders or scaffolds, occasional balancing, stooping, kneeling, crouching, and crawling, and requires the use of a cane for periods for longer ambulation. (Tr. 16-19). Plaintiff is unable to perform his past relevant work (Tr. 19; 20 C.F.R. § 404.1565), but the ALJ concluded there are jobs that exist in significant numbers in the national economy that the plaintiff can perform, such as the job of an inspector of light fixtures and a coiled-coil inspector. (Tr. 20; see 20 C.F.R. §§ 404.1569, 404.1569(a), 404.1568(d)). According to the

ALJ, plaintiff has not been under a disability from April 15, 2009 through the date of his decision. (Tr. 20; 20 C.F.R. §§ 404.1520(g)).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ erred in that plaintiff demonstrated multiple combined impairments meeting or equaling the Listing 1.02 for Major Dysfunction of a Joint and Spinal Impairment, and meeting or equaling Listing 1.04 for Disorders of the Spine (Dkt. #18, Brief at 15-21, 26-30); the ALJ erred in rejecting plaintiff's credibility (id. at 21-23); and the ALJ did not follow the treating physician rule (id. at 23-26).

In response, defendant contends that substantial evidence supports the ALJ's finding that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listed impairments (Dkt. #19, Brief at 4-8); substantial evidence supports the weight the ALJ afforded to the opinion evidence of the record (id. at 8-9); and substantial evidence supports the ALJ's credibility finding (id. at 10-12).

A. LISTING 1.04

Listing 1.04 relates to disorders of the spine, and there are three subsections of Listing 1.04: (A), (B), and (C), only one of which needs to be satisfied for a claimant to meet the Listing requirements.  To satisfy Listing 1.04, plaintiff must establish the existence of a disorder of the spine: "(e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root . . . or the spinal cord."[11]  20 C.F.R. Pt. 404, Subpt. P, App. 1,

---

[11]Listing 1.04(A) requires

Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with

Listing 1.04.  In his decision, the ALJ found that:

> Turning to Listing 1.04, an MRI of the cervical spine establishes that the claimant has mild central spinal stenosis at C5-6, moderate left and moderately severe right C5-6 and moderate bilateral C6-C7 neuroforaminal stenosis, and an MRI of the lumbar spine establishes that the claimant has a small left paracentral protrusion at L5-S1, satisfying the requirement for a disorder of the spine.  There is no evidence of nerve root compressions characterized by motor loss, as required by the listing.  On the contrary, nerve conduction studies showed no significant evidence of peripheral neuropathy or cervical radiculopathy.  In addition, physical examination revealed no true dermatomal distribution of any symptoms.

(Tr. 15-16)(internal citations omitted).  The objective medical evidence, however, is not entirely consistent with the ALJ's findings. Contrary to the ALJ's finding that there was "no significant evidence of peripheral neuropathy[,]" Dr. Forshaw found that an "EMG performed demonstrat[ed] bilateral lower extremity peripheral neuropathy." (Tr. 287).  Moreover, Dr. Forshaw noted decreased sensation in the bilateral lower extremities, and in the right thigh. (Id.).  He sent plaintiff for an MRI of the cervical and lumbar spin to evaluate for cord compression (id.), and on December 1, 2011, the results of a cervical spine MRI revealed spondylosis, most significant from C4 to C7; superimposed protrusions at C3-4, C5-6 and C6-7; significantly narrowed right neural foramina at C5-6; and disk herniation at C4-5 causing mild cord compression, greater to the left of midline.  (Tr. 288)(emphasis added).  An MRI of the lumbar spine, performed the same day, revealed a small broad left paracentral

---

associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04(A).

To satisfy Listing 1.04(C), a claimant must establish the initial criteria of disorders of the spine in Listing 1.04, along with, "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing § 1.04(C).

protrusion at L5-S1.  (Tr. 289).  Eight days later, a CT scan of plaintiff's cervical spine revealed spondylotic changes of the cervical spine at C5-6 and C6-7 with posterior osteophyte-disc complexes and posterior facet and uncovertebral joint hypertrophy.  (Tr. 290; see Tr. 290-91).  Additionally, there was mild central spinal stenosis at C5-6, and moderate left and moderately severe right C5-6 and moderate bilateral C6-7 neuroforaminal stenosis.  (Tr. 290). The ALJ accounts for most of the objective findings but concludes that there is "no evidence of nerve root compressions characterized by motor loss, as required by the listing." (Tr. 15).  In so concluding, the ALJ ignores the mild spinal cord compression noted in the December 1, 2011 MRI, and the ALJ disregards the medical findings relating to motor loss in plaintiff's upper and lower extremities. Upon examination of plaintiff in December 2011, Dr. Kawalick noted, consistent with Dr. Forshaw's findings, that plaintiff had diminished pin sensation in the right upper extremity which spans several dermatomes including C5, C6, and C7, and in the right lower extremity the pin sensation was blunted distally.  (Tr. 313).  He noted that the "[p]osition sense appears mildly reduced in the lower extremities bilaterally and there is mild to moderate reduction in vibration sense."  (Id.).  Dr. Kawalick opined that the right upper extremity numbness could certainly be related to plaintiff's cervical disease. (Tr. 314).

While it "is not the place of the district court to weigh the credibility of complex, contradictory evidence, or reconsider anew whether the claimant is disabled[,]" the district court must "ensure that the ALJ has faithfully fulfilled his legal duties." Sutherland v. Barnhart, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004), citing Schaal v. Apfel, 134 F.3d 496, 500-01 (2d Cir. 1998). Plaintiff correctly asserts that an ALJ is not entitled to "simply pick and choose from the transcript only such evidence that support[ed] his determination." (See Dkt.

#18, Brief at 29-30, quoting Sutherland, 322 F. Supp. 2d at 289; see also Ardito v. Barnhart, No. 3:04 CV 1633(MRK), 2006 WL 1662890, at *5 (D. Conn. May 25, 2006)(ALJ erred when he "cherry-picked out of the record those aspects of the physicians' reports that favored his preferred conclusion and ignored all unfavorable aspects . . . .")).  "It is grounds for remand for the ALJ to ignore parts of the record that are probative of the claimant's disability claim." Sutherland, 322 F. Supp. 2d at 289 (multiple citations omitted).

B. LISTING 1.02A

Listing 1.02(A), "Major dysfunction of a joint(s) (due to any cause)[,]" is defined as requiring joints:

> [c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
>> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> or
>
>> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R  Pt. 404, Subpt. P. App. 1, 1.02(A)(2012)(emphasis added).  The term "inability to ambulate effectively" is defined as:

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities . . . .

20 C.F.R. Part 404 Subpt P App. 1, 1.00B2b(1)(2012)(emphasis added).

As explained further in 1.00B2b(2):

To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace . . . . The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00B2b(2) (emphasis added).

In his decision, the ALJ concludes that

though medical evidence of record establishes that the claimant has major dysfunction of his right hip characterized by gross anatomical deformity, chronic joint pain and stiffness, signs of limitation of motion, and findings of joint space narrowing and bony destruction on appropriate medically acceptable imaging studies, the evidence does not support a finding that the claimant's osteoarthritis results in the inability to ambulate effectively, as described in 1.00B2b and as required by the listing.

(Tr. 15).

It is undisputed that the claimant bears the burden of proof at the first four steps of the sequential evaluation.   Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)(citation omitted).   In this case, there is no dispute, as the ALJ found, that plaintiff's right hip impairment satisfies the first part of Listing 1.02; the issue is whether the ALJ's conclusion that the "evidence does not support a finding that the claimant's osteoarthritis results in the inability to ambulate effectively" is supported by substantial evidence.

Plaintiff's subjective testimony that he is unable to walk long distances, defined as one hundred feet (Tr. 200-01), and that he must wait at the front of a store while his

children would pick up the items he needs (Tr. 43), his report to his doctor that he has difficulty walking more than a block, and taking stairs, which he needs to do one at a time (Tr. 283), his testimony that when he was working, his legs would swell and he would be in such pain the more time he spent on his feet that by the end of the day, he was "basically limping around" (Tr. 38), and his testimony that he must use a cane "towards the middle, end of the day when [he is] really starting to hurt more[,]" (Tr. 50-51; <u>see also</u> Tr. 283 (report to Dr. Carangelo occasional use of a case)),  is supported by the medical opinions of record.

Defendant, however, contends that the ALJ "properly found that plaintiff's subjective statements were not credible to the extent that they conflicted with the assessed RFC finding[]" that plaintiff can perform sedentary work with occasional climbing of stairs and ramps, occasional balancing, stooping, kneeling, crouching and crawling, and the use of a cane for periods of longer ambulation,  (Dkt. #19, Brief at 6; Tr. 16, 18), so that plaintiff's reliance on his subjective statements is "not persuasive."  (Dkt. #19, Brief at 6). However, the ALJ's credibility assessment is not supported by substantial evidence.

In reaching his decision, the ALJ noted that "[a]lthough [plaintiff] has alleged one-year history of difficulty with his hands, he has not sought treatment[,]" and he noted that "claimant chose to proceed with conservative management" of his hip impairment rather than undergoing a total hip arthroplasty which was suggested to plaintiff by Dr. Rubin and by Dr. Carangelo.  (Tr. 15, 18).  Pursuant to Social Security Ruling 96-7p:

> the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record . . . [including that] [t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services.

1996 WL 374186, at *7-8 (S.S.A. July 2, 1996).  In this case, the ALJ failed to consider plaintiff's reasons for not pursuing hip surgery and further treatment on his hands.  As plaintiff testified, and as he explained to Dr. Rubin, plaintiff could not afford the recommended medical treatment.  According to Dr. Rubin, plaintiff's condition "would be best treated with a total hip arthroplasty and a ceramic articulation given his relatively young age." (Tr. 244, 262, 264).  Dr. Rubin continued, "[t]he patient explained to me that his insurance is running out through COBRA in the next [two] weeks, and I have told him that his hip surgery is not an urgent or emergent need and thus it would be hard to justify rushing him to the hospital to have a hip replacement in the next [ten] to [fourteen] days." (Id.).  The hip surgery "can be done safely at some time in the next few months or few years and the only danger of waiting is that he may have ongoing pain and stiffness in the hip." (Id.).  Dr. Rubin opined that plaintiff "may also benefit from oral anti-inflammatories in the meantime[,]" and a hip steroid injection could be considered if his pain became "rather acute." (Id.).  Dr. Carangelo also opined that plaintiff could undergo a total hip arthroplasty, but plaintiff opted to take anti-inflammatories as necessary.  (Tr. 283-84). Similarly, plaintiff explained to the ALJ at his hearing that his wife had just gone back to work and received health insurance, but that the deductible is "very large" and  he is "not in the position right now to be able to afford that and be in rehab." (Tr. 49).   Rather than considering any of the foregoing, as required by SSR 96-7p, the ALJ assigns negative credibility towards plaintiff for plaintiff's lack of hip surgery and his minimal treatment, and the ALJ, in turn, discounts plaintiff's subjective statements about his inability to effectively ambulate, without weighing them in light of the medical record.

Plaintiff's medical records reflect that plaintiff's walking is more akin to "shuffling[,]"

and he "drag[s] his right leg with an outward turned foot." (Tr. 287). Dr. Forshaw noted that plaintiff walks with a "very stiff limp[,]" and he "stands with discomfort[,]" and "rises from a chair with moderate discomfort." (Tr. 286-87). Similarly, Dr. Carangelo noted that plaintiff walks with an antalgic gait, and "[h]is symptoms" of difficulty walking more than a block, taking stairs one at a time and using railing for support, are "consistent with osteoarthritis secondary to slipped capital demoral epiphysis." (Tr. 283). As discussed above, Section 1.00B2b(2) details examples of "ineffective ambulation[,]" which include, "but are not limited to," "the inability to carry out routine ambulatory activities, such as shopping and banking, . . . the inability to climb a few steps at a reasonable pace[,]" and the inability to walk at a reasonable pace. Defendant contends that while plaintiff relies on "evidence that he has difficulty walking due to degenerative joint disease in his right hip, varicose veins and swelling in his right leg, and his need to use a cane to walk longer distances[,]" plaintiff "never explains how this evidence established the requisite inability to ambulate effectively." (Dkt. #19, Brief at 5). However, to the contrary, while plaintiff appropriately notes the medical evidence of the impairments that make it difficult for him to walk, such as his "bone on bone" degenerative joint disease, his leg length discrepancy, and his chronic pain, plaintiff's medical providers also noted plaintiff's inability to ambulate effectively as detailed above. (See Tr. 50, 275, 283). In addition to failing to consider the medical entries relating to plaintiff's inability to ambulate effectively, the ALJ did not consider his multiple impairments in combination, and as a result, their impact on the criteria identified in both Listing 1.02 and Listing 1.04, and specifically, Listing 1.04(C).[12]

---

[12]The ALJ assigned no weight to the opinion of Dr. Dejesus, plaintiff's podiatrist, on grounds that an opinion on the impact of vascular issues should come from a vascular surgeon and not from a podiatrist. However, the ALJ recites the vascular surgeon's findings relating to plaintiff's lower extremity swelling with varicose veins, and the objectively consistent doppler ultrasound

Moreover, although defendant contends that the fact that plaintiff has walked with a limp since he was thirteen years old is relevant in that it "did not prevent him from working for many years as an electrical engineer[,]" (Dkt. #19, Brief at 7, n.3), defendant ignores the medical opinion of Dr. Rubin, plaintiff's orthopedic doctor in 2010, that while plaintiff "seems to have gotten [thirty-six] years of good use out of this hip[,]" plaintiff's "hip condition has worsened over time and he now has evidence of flattening of the femoral head and destruction of cartilage in the joint[]" which accounts for plaintiff's worsening condition.  (Tr. 244, 262, 264).[13]

## V. CONCLUSION

Accordingly, plaintiff's Motion for Reversal or Remand (Dkt. #18) is granted in part such that this matter is remanded for further consideration consistent with this Recommended Ruling; defendant's Motion to Affirm (Dkt. #19) is denied.

The parties are free to seek a district judge's review of this recommended ruling.  See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local

---

findings, and then goes on to discount the severity of the vascular surgeon's findings based on a treatment note relating to plaintiff's vascular issues authored by plaintiff's primary care physician.  (Tr. 17-19).  Again, as stated above, such "cherry-picking" of the record is grounds for remand.  See Ardito, 2006 WL 1662890, at *5; Sutherland, 322 F. Supp. 2d at 289 (multiple citations omitted).

[13]Additionally, "SSA regulations provide that the fact-finder will consider all of the evidence presented, including information about your prior work record." Schaal, 134 F.3d at 502 (internal quotations & citation omitted)(work history may be deemed probative of credibility).  In this case plaintiff had a solid, consistent work history before he was laid off for an inability to physically perform the requirements of his job.  The ALJ makes no reference to his work history other than to note plaintiff's inability to perform his past relevant work.  (See Tr. 19).  "Although failure to consider [a claimant's] work history 'in and of itself does not require a reversal,' it 'is something the ALJ should consider on remand.'"  Wages v. Comm'r of Soc. Sec., No. 11 CV 1571(JCH), 2013 WL 3243116, at *4 (D. Conn. June 26, 2013), quoting Malloy v. Astrue, No. 3:10 CV 190 (MRK)(WIG), 2010 WL 7865083, at *29 (D. Conn. Nov. 17, 2010); see SSR 96-7p, at *5.

Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 18th day of February, 2014.


 /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge